IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN WILSON, | : | Civil No. 3:18-cv-1637 |
| Plaintiff | : | (Judge Mariani) |
| v. | : | |
| DENNIS GROMEL, et al., | : | |
| Defendants | : | |

**MEMORANDUM**

Plaintiff Kevin Wilson ("Wilson"), an inmate who was confined at all relevant times at the State Correctional Institution at Dallas, Pennsylvania ("SCI-Dallas"), initiated this action pursuant to 42 U.S.C. § 1983. The remaining Defendants are Correctional Officers Dennis Gromel and Christopher Wilson. Before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Docs. 91, 99). For the reasons set forth below, Plaintiff's motion (Doc. 91) for summary judgment will be denied and Defendants' motion (Doc. 99) for summary judgment will be granted in part and denied in part.

I.  **Statement of Undisputed Facts**[1]

On February 3, 2018, at 7:15 p.m., Plaintiff Wilson was at the telephone area on the C-Block housing unit at SCI-Dallas. (Doc. 92 ¶ 1; Doc. 100 ¶¶ 1-2 Doc. 109 ¶¶ 1-2; Doc. 110 ¶¶ 1-2). Defendant Gromel states that he observed inmate Plaintiff Wilson engage in a small, verbal altercation with another inmate while at the phones on the C-Block housing unit on February 3, 2018, at 7:15 p.m. (Doc. 100 ¶ 3). Defendants Gromel and Christopher Wilson gave the inmates a direct order to stop arguing, and the inmates complied with the order. (Doc. 92 ¶¶ 2-3; Doc. 100 ¶¶ 4-5). Plaintiff Wilson contends that the inmates "stated they would come back and 'kill' [him]" and that Defendants Gromel and Wilson heard this threat. (Doc. 92 ¶ 3). Plaintiff Wilson did not inform Defendants about this initial incident; however, he maintains that they witnessed the incident because they were at a desk two feet away. (Doc. 100 ¶ 7; Doc. 109 ¶ 7; Doc. 110 ¶ 7).

The parties dispute whether Plaintiff Wilson requested medical attention at that time. (Doc. 92 ¶ 4; Doc. 100 ¶ 6; Doc. 109 ¶ 6; Doc. 110 ¶ 6). Plaintiff Wilson asserts that he first asked Defendant Gromel to call for medical attention, but Gromel informed him that he was

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (Docs. 92, 100, 103, 109, 110). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the Court cites directly to the statements of material facts.

2

a trainee, and that Wilson should ask Defendant Wilson. (Doc. 92 ¶ 4). Wilson claims that he then requested medical attention through Defendant Wilson, to which he allegedly responded that Wilson should "learn how to fight" and that he would not call medical. (*Id.*).

Defendants contend that Wilson cannot produce any competent admissible evidence to support the following allegations: (1) that he informed Defendants, prior to the first incident, that he had received any threat against his person or had reason to be afraid for his safety; (2) that he informed Defendants of the unidentified attacker's identity after the first incident; (3) that he informed Defendants that he had a longstanding, pervasive tension with the unidentified inmate attacker either before or after the first incident; and (4) that he informed Defendants that the unidentified attacker threatened to attack him at some future point in time after the first incident. (Doc. 100 ¶¶ 8-11; Doc. 109 ¶¶ 8-10). Wilson agrees that he never alleged that he received any threats prior to the first attack, he never alleged that he knew the identities of the attackers, he never alleged that he had a longstanding, pervasive tension with the unidentified inmate attackers either before or after the first incident, and he cannot produce any evidence to support an allegation that he informed Defendants that the unidentified attackers threatened to attack him at some point after the first incident. (Doc. 109 ¶¶ 8-10; Doc. 110 ¶¶ 8-11). Wilson asserts that Defendants witnessed the attacks and overheard the threat. (Doc. 92 ¶ 3; Doc. 109 ¶ 11; Doc. 110 ¶ 11).

On February 3, 2018, at approximately 7:30 p.m., another altercation ensued. (Doc. 92 ¶ 5; Doc. 100 ¶ 12). Defendants claim that Wilson engaged in a physical altercation with inmate Outlaw, whereas Wilson maintains that the initial two attackers returned to assault him and that he never fought with inmate Outlaw. (*Id.*). When the two attackers returned, Wilson states that he "took cover" behind inmate Outlaw, who was using the phone next to him. (Doc. 92 ¶ 5). The parties agree that Defendant Wilson contacted control to report this second physical altercation. (Doc. 92 ¶ 5; Doc. 100 ¶ 13; Doc. 109 ¶ 13; Doc. 110 ¶ 13). Defendant Wilson states that he ordered Wilson and inmate Outlaw to stop fighting. (Doc. 100 ¶ 14). Defendants contend that both inmates complied with Defendant Wilson's direct order and ceased fighting. (Doc. 100 ¶ 15). Wilson and inmate Outlaw were then secured with restraints. (Doc. 92 ¶ 5; Doc. 100 ¶ 15; Doc. 109 ¶ 15; Doc. 110 ¶ 15). Defendants did not find any weapon on Wilson or inmate Outlaw. (Doc. 100 ¶ 16; Doc. 109 ¶ 16; Doc. 109 ¶ 16; Doc. 110 ¶ 16). As a result of the altercation, Wilson received several puncture wounds and complained of difficulty breathing. (Doc. 100 ¶¶ 17-18; Doc. 109 ¶¶ 17-18; Doc. 110 ¶ 16). Wilson was taken to the infirmary and then transported to an outside hospital for further medical assessment and treatment. (Doc. 92 ¶ 6; Doc. 100 ¶ 19; Doc. 109 ¶ 19; Doc. 110 ¶ 19). He states that he had a collapsed lung, emotional injuries, and spent the night in the intensive care unit. (Doc. 92 ¶¶ 6, 18; Doc. 109 ¶¶ 17, 19; Doc. 110 ¶ 17). When Wilson returned to SCI-Dallas the following day, he remained in the infirmary

4

until February 8, 2018, and was then placed in the Restricted Housing Unit ("RHU"). (Doc. 92 ¶¶ 6, 8).

Wilson states that the two inmates who attacked him were captured on February 4, 2018, and a weapon was found in their cell. (Doc. 92 ¶ 9). He also asserts that he received a false misconduct charging him with fighting with inmate Outlaw. (*Id.* ¶ 10). Both Wilson and inmate Outlaw were found guilty of their respective misconducts and received punishment of 90 days in the RHU. (*Id.* ¶¶ 11-12). Wilson claims that the SCI-Dallas Security Office conducted a subsequent investigation which resulted in the dismissal of inmate Outlaw's conviction and punishment. (*Id.* ¶ 15).

Wilson also asserts that another inmate, Raymond Bruton, was outside the phone room, waiting in line to use the phone, and witnessed the February 3, 2018 incident. (Doc. 92-2; Doc. 109 ¶ 28; Doc. 110 ¶ 28). The parties agree that inmate Bruton was not physically present in the phone room during the February 3, 2018 incident. (Doc. 100 ¶ 28; Doc. 109 ¶ 28; Doc. 110 ¶ 28).

On February 20, 2018, Wilson submitted grievance number 722965. (Doc. 100 ¶ 20; Doc. 109 ¶ 20; Doc. 110 ¶ 20). Monetary relief was not requested in the grievance. (*Id.* ¶ 21). On March 29, 2018, Wilson submitted grievance number 728984. (*Id.* ¶ 22). Wilson did request monetary relief in the grievance. (*Id.* ¶ 23).

During this time, Wilson filed three other grievances—numbers 723661, 748935, 775638—which do not pertain to the issues in the instant action. (Doc. 100 ¶¶ 24-27; Doc. 109 ¶¶ 24-27; Doc. 110 ¶¶ 24-27).

## II. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P.

6

56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

Courts are permitted to resolve cross-motions for summary judgment concurrently. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008); *see also Johnson v. Fed. Express Corp.*, 996 F.Supp.2d 302, 312 (M.D. Pa. 2014); 10A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2720 (3d ed. 2015). When doing so, the court is bound

to view the evidence in the light most favorable to the non-moving party with respect to each motion. FED. R. CIV. P. 56; *Lawrence*, 527 F.3d at 310 (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

## III. Discussion

### A. Eighth Amendment Inadequate Medical Care Claim

#### 1. Exhaustion of Administrative Remedies

Defendants first seek the entry of summary judgment based on Wilson's failure to properly exhaust his administrative remedies with respect to the denial of medical care claim, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e)a. The PLRA "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."). "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules,' rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citation omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Accordingly, a prisoner who fails to request monetary damages in the grievance process is barred from bringing a claim for monetary relief in federal court. *See Cunningham v. Zubsic*, 2019 WL 134209, at *5 (W.D.

Pa. Jan. 8, 2019); *Wright v. Sauers*, 729 F. App'x 225, 227 (3d Cir. 2018). To "complete the administrative review process," means "substantial" compliance with the prison's grievance procedures. *Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004) (citing *Nyhuis*, 204 F.3d at 77-78).

While the PLRA requires that prisoners comply with the procedural demands of a system created by their jailors, those jailors must also comply with the demands of the system they created. *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019). Consequently, "[a]s soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." *Id.*

"The only limit to § 1997e(a)'s [exhaustion] mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Ross*, 136 S. Ct. at 1862 (quoting § 1997e(a)). In other words, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* at 1858 (quoting § 1997e(a)). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001) (internal citations and quotation marks omitted)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are

'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1859 (quoting *Booth*, 532 U.S. at 738).

In the instant case, Defendants argue that Wilson failed to properly exhaust his administrative remedies with respect to the denial of medical care claim prior to filing suit. (Doc. 101, pp. 10-14). Specifically, Defendants assert that the two relevant grievances do not mention any facts related to the alleged denial of medical care and do not seek monetary relief. (*Id.* at pp. 13-14). In response, Wilson argues that the administrative remedy process was rendered unavailable to him. (Doc. 107, pp. 1-3).

The record reflects that Wilson filed two grievances related to the February 3, 2018 incident. (*See* Doc. 100-3). On February 20, 2018, Wilson submitted grievance number 722965, which he states was his "second grievance" concerning the February 3, 2018 assault. (Doc. 100-4). He states that he submitted a grievance on February 8, 2018, but did not receive a grievance number, and that his grievances "were not being answered." (*Id.*). On March 29, 2018, Wilson submitted grievance number 728984, wherein he inquired as to the investigation of the assault and stated that he had not received a reply or response to his inmate request slip. (Doc. 100-7). Wilson did not mention the denial of medical care and did not seek monetary relief[2] in either grievance. (*See* Doc. 100-4; Doc. 100-7). However, the grievances of record indicate that Wilson attempted to file an initial grievance

---

[2] The DOC's Inmate Grievance System, set forth in DC-ADM 804, specifically provides that "[i]f the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance." DC-ADM 804 § 1(A)(11)(d), available at: https://www.cor.pa.gov/About%20Us/Pages/DOC-Policies.aspx (last accessed January 27, 2023).

10

concerning the February 3, 2018 incident and that officials at SCI-Dallas failed to process the grievance. In the grievances, Wilson expressed concerns that he either was not receiving a response to his grievance or that the grievance he submitted was not being handled properly. Given these submissions, the Court concludes that a genuine issue of fact exists as to whether the grievance process was rendered unavailable to Wilson such that his failure to properly exhaust his medical care claim could be excused. Thus, the Court declines to grant summary judgment on the basis that Wilson failed to properly exhaust his denial of medical care claim. Accordingly, the Court considers the merits of the claim below.

### 2.   Merits

For the delay or denial of medical care to rise to a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, a prisoner must demonstrate "(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Deliberate indifference has been found where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed

or recommended treatment." *Rouse*, 182 F.3d at 197. Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)). "Allegations of medical malpractice are not sufficient to establish a Constitutional violation," nor is "[m]ere disagreement as to the proper medical treatment." *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). A "failure to provide adequate care ... [that] was deliberate, and motivated by non-medical factors" is actionable under the Eighth Amendment, but "inadequate care [that] was a result of an error in medical judgment" is not. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

Wilson asserts that after the first incident at 7:15 p.m., Defendants failed to contact the medical department. Wilson testified that, after the first incident, he approached Defendants and told them he could not breathe. He contends that there was visible blood on his face and hands and puncture wounds on his face, shoulder, and the back of his neck. Less than fifteen minutes later, the second altercation occurred. During this second assault, Wilson asserts that received an additional three or four stab wounds to his chest, back, and arm. The record confirms that after the second incident, Wilson was immediately escorted to the infirmary. He was evaluated, treated, and transferred to an outside hospital for further

treatment. Wilson remained in the hospital for one night, and upon his return to SCI-Dallas, he remained in the infirmary for an additional four days. In the end, Defendant Wilson contacted control at 7:30 p.m., Plaintiff Wilson was escorted to medical at 7:31 p.m. and sent to an outside hospital at 8:35 p.m. on February 3, 2018—approximately one hour and ten minutes after the first assault. (Doc. 100-1, pp. 4, 13, 18).

In support of his contentions, Wilson has provided an affidavit from a fellow inmate, Raymond Bruton. (Doc. 92-2). The affidavit substantially corroborates Wilson's description of the incident and, coupled with the medical records, creates a genuine issue of material fact as to whether Defendants were deliberately indifferent to Wilson's serious medical needs. The Court concludes that a reasonable jury could infer that Defendants delayed Wilson's medical care and transport to an outside hospital. Accordingly, the Court will deny the parties' summary judgment motions with respect to this claim.

## B.  Eighth Amendment Failure to Protect Claim

The Eighth Amendment requires prison officials to "take reasonable measures to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. While prison officials have the duty to protect prisoners from attacks by other prisoners, not every injury suffered by a prisoner at the hands of another implicates liability for the officials responsible for that inmate's safety. *See id.* at 833-34. Rather, an inmate raising a failure to protect claim under the Eighth Amendment must establish that a prison official both knew of and chose to disregard an "excessive risk to inmate health or safety." *Beers-Capitol v.*

*Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 837). This knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *See id.*; *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).

Actual knowledge may be proven circumstantially in situations where the general danger was obvious. *See Farmer*, 511 U.S. at 842. For example, if the prisoner presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Id.* at 842-43 (quotation omitted).

Here, Wilson concedes that he did not receive any threats of violence prior to the first incident on February 3, 2018 and he did not know the identity of the attackers. As to this first incident, it is undisputed that Wilson did not inform *anyone* that he was in imminent danger of being attacked by his assailants prior to the incident—indeed, it is undisputed that Wilson himself did not believe he was in any danger.

But if Defendants became aware of the threat of an assault by the other inmates prior to the second attack, they had a duty to take reasonable steps to intervene to protect Wilson from the attacking inmates. *See Bistrian v. Levi*, 696 F.3d 352, 371-72 (3d Cir.

2012), *abrogated on other grounds by Bistrian v. Levi*, 912 F.3d 79, 95-96 (3d Cir. 2018); Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002). There are disputed issues of material fact as to the actions during the second attack. Defendants maintain that Wilson never informed them that other inmates attacked him at 7:15 p.m., that he suffered from multiple puncture wounds, or that the inmates threatened to attack him in the future. (Doc. 101, pp. 24-27). Defendants further maintain that they took immediate steps after the second incident by contacting control, requesting backup, and ordering the inmates to stop fighting. According to Defendants, during the second incident, Wilson engaged in an altercation with fellow inmate Outlaw. Meanwhile, Wilson testified that he never fought with inmate Outlaw; rather, it was two other, unidentified inmates who attacked him. Wilson contends that Defendants witnessed the first attack and did not take any steps to protect him after they witnessed the first attack. He further contends that he specifically informed Defendants that the inmates threatened to return and kill him, but they did not take any steps to protect him after learning of this threat. Under these circumstances, the Court finds that a reasonable jury could conclude that Defendants had "a realistic and reasonable opportunity to intervene" to protect Wilson but refused to do so. *Bistrian*, 696 F.3d at 371-72; *Smith*, 293 F.3d at 650-51. Accordingly, with respect to the failure to protect claim, the parties' summary judgment motions will be denied.

## C.  Qualified Immunity

The doctrine of qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. *Pearson v. Callahan*, 555 U.S. 223, 244-45 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231. "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing *Pearson*, 555 U.S. at 244). The burden to establish qualified immunity rests with the defendant claiming its protection. *Beers-Capitol*, 256 F.3d at 142 n.15.

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier* prongs should be addressed first).

Defendants argue that they are entitled to qualified immunity with respect to the failure to protect claim. (Doc. 101, pp. 28-29). In support of their argument, Defendants assert that "even assuming, *arguendo*, for purposes of summary judgment that Defendants violated Plaintiff's constitutional rights, these rights were not clearly established given the

16

facts of this case and the information in the Defendants' possession at the time." (*Id.*). The relevant inquiry is whether Defendants failed to protect Wilson from a risk of harm from other inmates. As discussed above, there exist genuine disputes of material fact on the merits of Wilson's failure to protect claim. Moreover, it is well-settled that "the right to be protected against violence inflicted by other inmates is clearly established." *Williams v. Smith*, 507 F. App'x 260, 263 (3d Cir. 2012) (citing *Beers-Capitol*, 256 F.3d at 142 n.15). Therefore, the Court concludes that Defendants are not entitled to qualified immunity at this time.

### D. State Tort Claim

Defendants seek an entry of summary judgment on Wilson's state law tort claim of negligence, arguing that the doctrine of sovereign immunity bars this claim against state employees. (Doc. 101, pp. 29-31). In response, Wilson "request[s] [that] this court let plaintiff's negligence clai[]m against the defendants[] to be heard in state court." (Doc. 107, p. 5).

Defendants are entitled to sovereign immunity with respect to Wilson's state law claim as it is beyond dispute that "[t]he Department of Corrections is an agency of the Commonwealth and the Defendants, as employees of an agency of the Commonwealth, are entitled to the protection afforded by sovereign immunity." *McGrath v. Johnson*, 67 F.Supp.2d 499, 511 (E.D. Pa. 1999) (citing *Maute v. Frank*, 441 Pa. Super. 401, 402, 657 A.2d 985, 986 (1995) (state prison officials enjoy sovereign immunity); *Robles v.*

17

*Pennsylvania Dep't of Corrections*, 718 A.2d 882, 884 (Pa. Commw. Ct. 1998) (same)), *aff'd*, 35 F. App'x 357 (3d Cir. 2002). As a general matter, subject only to ten specific statutory exceptions not applicable here, this sovereign immunity bars state law tort claims like the one alleged here, since Commonwealth employees are immune from liability for either negligence or intentional torts.[3] *McGrath*, 67 F.Supp.2d at 511, *aff'd*, 35 F. App'x 357 (3d Cir. 2002). Defendants are entitled to an entry of summary judgment on the state law tort claim.

## IV. Conclusion

Plaintiff's motion (Doc. 91) for summary judgment will be denied and Defendants' motion (Doc. 99) for summary judgment will be granted in part and denied in part. A separate Order shall issue.

_____
Robert D. Mariani
United States District Judge

Dated: February 17, 2023

---

[3] The ten categories for which sovereign immunity will not apply are: (1) vehicles in the possession or control of a Commonwealth party; (2) acts of health care employees of Commonwealth agency medical facilities or institutions; (3) the care, custody, or control of personal property; (4) a dangerous condition of Commonwealth agency real estate and sidewalks; (5) dangerous conditions of highways created by potholes or sinkholes; (6) the care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse. *See* 42 PA. CONS. STAT. ANN. § 8522(b).